UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                   )
**JERRY LEWIS BEY,**               )
                                   )
       **Plaintiff,**   )
                                   )
                                   )  Civil Action No. 05-2241 (JGP)
  v.                              )
                                   )
**U.S. DEPARTMENT OF JUSTICE,**    )
                                   )
**Defendant.**                     )
_____)

**Def. Exh. MMM**

Nos. 93-3386, 93-3448, 93-3449, 93-3451,
93-3452, 93-3453, 93-3456 EMSL
Criminal

IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

UNITED STATES OF AMERICA,
Appellee,

v.

JERRY LEE LEWIS, CARLA SIMONE SEALS,
RAYMOND AMERSON, NOBLE BENNETT,
CARLTON DARDEN, GERALD HOPKINS,
AND MICHAEL WILLIAMS,
Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

BRIEF OF APPELLEE

EDWARD L. DOWD, JR.
United States Attorney

MICHAEL K. FAGAN
MARY JANE LYLE
DEAN R. HOAG
DANIEL E. MEULEMAN
SAM C. BERTOLET
Assistant United States Attorneys
1114 Market Street, St. Louis, Missouri 63101

Attorneys for Appellee

movement (hereinafter, "MSTA"), soon finding that a subset, primarily comprised of the movement's local leaders and adherents, was involved in illegal drug activities, in which they were led by Jerry Lewis (Tr. 8, p. 54-60). In prison, Weaver was asked to send workers to the members who were dealing in drugs (Tr. 8, p. 59). After Weaver's 1985 release from prison, he eventually began dealing in cocaine in Kansas City (through separate contacts he had there) but, during this period, he would sometimes acquire cocaine from, and distribute cocaine to, members or associates of the St. Louis temple who Weaver knew to be involved in the drug dealing component of the local congregation (Tr. 8, p. 69). Weaver returned to St. Louis in Autumn, 1987, and soon met with active members of this enterprise (Jerry Lewis, Michael Williams, Gerald Hopkins, and Gary Hamell), arranging at the meeting to begin receiving a supply of cocaine for redistribution (Tr. 8. pp. 74-79). The initial delivery of the drug occurred at a store (which Lewis operated in north St. Louis) (Tr. 8, p. 79), as did some subsequent deliveries, with Weaver thereafter frequently receiving his cocaine inventory through couriers such as Raymond Amerson and Hamell (Tr. 8, p. 90). With Weaver's immersion into the group's activities came to him a sharing of information among the

---

surname (to indicate attributes or qualities a member supposedly has and his/her Moroccan tribe or family of origin). Using the MSTA as a veneer of legitimacy and community responsibility, the entity referred to in the indictment as the "enterprise" and in this Statement of Facts as the "Jerry Lewis Organization" (hereinafter, the JLO) was formed by the defendants and their criminal associates. Though less formal in structure than the MSTA, the JLO had much the same membership as the St. Louis "Subordinate Temple No. 1" of the MSTA.

6

conspirators about past and upcoming murders and participation in surveillance to effect murders useful to members of the group (Tr. 8, pp. 97-101, 102, 104-111, 113, 117-118, 120-128, 130-136, 140, 158, 187-189, 210-218, 243-249, 251-258, 281-282; Tr. 9, p. 58), as well as access to increasing amounts of cocaine for redistribution, participation and knowledge about its sources and distribution means, and personal involvement in the group's local kilogram sales, storage and repackaging (Tr. 8, pp. 81-88, 125-127, 136-137, 143-154, 159-162, 167-169, 194-207, 217-240, 270-277, 290; Tr. 9, pp. 8-9). The sharing of drug and murder information among the enterprise's members enabled the members to better perform their jobs, to avoid apprehension or retaliation and to defeat competing drug traffickers (Tr. 8, pp. 90-95). None of Weaver's testimony indicated any termination over the years of the Jerry Lewis-led enterprise, even after the arrest of most of its key members upon the initial indictment in January, 1991. Rather, Weaver explained how the group's key supplier, Juan Alfaro Gonzalez, was then still at large and capable of supplying the enterprise, as he had done as recently as November, 1990 (Tr. 8, pp. 270-277), and which he attempted to do in February, 1991, only to find that Weaver was then cooperating with authorities, leading to Alfaro's arrest and the seizure from Alfaro's car of four kilograms of cocaine (Tr. 9, pp. 15-36).

Michael Shepherd's testimony, similarly, reflected the existence of a single, on-going drug enterprise headed by Jerry Lewis. Incarcerated for much of the time Jerry Lewis was not,

7

conspire to and resort to murder, contract murder, and attempted murder in order to protect and further the enterprise's and its members' interests, which included selling heroin, T's and blues, marijuana, and, primarily, cocaine. (Tr. 37, pp. 5-10, 14-21, 21-24, 27-40, 151-156, 156-178, 186-209, 209-214, 216-228). At times, associates of the enterprise would purposely provide false information, whether in court or on the streets, in order to frustrate law enforcement and as a means of attempting to identify informants (Tr. 37, pp. 104, 109-111). None of Thomas Bey's testimony ever reflected an end to the Jerry Lewis-led enterprise, but the testimony did confirm that, prior to defendant Bennett's joining the Lewis enterprise in the late 1980's, Bennett's earlier enterprise at times did exchange information with, do business with, or conspire with the Jerry Lewis organization (Tr. 37, pp. 12-13, 49-51).

Michael Lewis Bey (younger brother to Jerry Lewis, brother-in-law to Carlton Darden) testified concerning his observation of and participation in the single, continuing drug-and-murder enterprise that his older brother directed and concealed through the more publicly visible MSTA activities. Like other participant-witnesses, Michael Lewis confirmed the importance to the enterprise's members of sharing information and intelligence among one another on topics like drug prices, on who were enemies of their co-conspirators, on likely sources of retaliation for past violence, on who were informants and how to dispose of them, and on which law enforcement officers were investigating the group's

10

criminal activities (Tr. 3/15/93, pp. 29-35).[3] Michael Lewis Bey knew that his brother equated drugs with money (Tr. 3/15/93, p. 18), upon Jerry Lewis' return from prison in April, 1978, and, within about two years, Michael had become criminally involved with the group, who he recalled as then (1980-81) including J. Lewis, C. Darden, R. Amerson, M. Williams, N. Bennett and others (Tr. 3/15/93, pp. 19, 36-38, 40, 45, 49). Initially, Michael Lewis observed or participated with this group in the storage, counting, transport and sales of large quantities of T's and blues (Tr. 3/15/93, pp. 19-22), taking a public stance against drugs while privately trafficking in the contraband (Tr. 3/15/93, p. 23). Members of the group purchased assets and rented cars and pagers in others' names (Tr. 3/15/93, pp. 50-51, 78-83), carried weapons for protection (Tr. 3/15/93, pp. 67-68, 86, 88-92), murdered people over money, as persons of adverse interests, and as suspected informants (e.g., Tr. 3/15/93, pp. 70-72, 73-75; Tr. 54, pp. 19-25, 26-29, 40-42, 42-49, 50-55, 88-103, 108-113, 114-116, 123-126, 130-132, 146-156, 233-247) and acted at the direction of Jerry Lewis (e.g., Tr. 2/15/93, pp. 62-63, 84, 129, 257-259) in the drug trade, utilizing coin-operated telephones and pagers to evade detection while communicating (Tr. 3/15/93, p. 87; Tr. 54, p. 62). Michael Lewis knew of the enterprise's involvement in the heroin trade (Tr. 54, pp. 29), participated in its cocaine trade (e.g., Tr. 54, pp.

---

[3] The initial transcript volume of witness Michael Lewis' testimony (from 3/15/95) has no volume number, but would be placed between volumes 53 and 54; hence, it is being cited by date (rather than by volume number, since volume 53 also contains testimony from 3/15/95 but by other government witnesses.)

11

XXIII. **POST-INDICTMENT INVESTIGATION; ENTERPRISE MEMBERS COOPERATE**

The initial indictment in this case was returned on January 9, 1991. That same night, a series of search warrants were executed at homes of, or houses linked with, some of the 15 initially-indicted defendants. At various locations, single and multiple handguns and long guns were seized (including some in a bag, or satchel), as were a few drug scales (some with cocaine residue), many photographs, photo albums and MSTA-related documents showing long associations among defendants, and occasional apparent drug notations. Found hidden in Jerry Lewis' sister's house at 5088 Emerson was found a stash of currency in excess of $50,000, jewelry and items of particular significance for management of a long-term urban drug organization--accumulated intelligence. In a scrapbook were news clippings, mostly from a St. Louis crime tabloid, recounting drug (and other) murders and crimes--a history of who did what to whom and when. Also found was a folder of loose pages containing police mugshots and background information about a variety of criminals. Furs were seized from Jerry Lewis' house. Bulletproof vests were also seized (Tr. 2-5).

Rudy Weaver was the first enterprise participant to cooperate after the indictment. Weaver knew several of his codefendants, including Jerry Lewis, Noble Bennett, Ray Amerson, and Michael Williams, since their youth in Pruitt-Igoe. He had then sold drugs, as did they. Weaver was eventually convicted of murder and sent to the Missouri prison system, where he joined the MSTA, studying there with Gary Hamell and Gerald Hopkins. "Street

69

sleeping. Lewis claimed he nudged Young awake, then shot him in the head, knocking Young's eye out of his skull and against a wall. In his trial testimony below, however, Ronnie Thomas Bey described what actually happened: he shot Young at Lewis' request and with Lewis', Williams' and Hopkins' assistance (Tr. 15, pp. 269-309; Tr. 28, pp. 167-168; Tr. 37, pp. 26-40).

Soon after Noble Bennett's brother, Ronnell, was murdered in 1988, Michael Williams told Parnell how he (Williams), Hopkins and Lewis had killed "Lil Rob" Young in the honor center. According to Parnell, Williams' account basically matched Lewis' (Tr. 28, pp. 169-170).

In about 1985, Parnell was called and asked by Lewis to come to the Family Market. In a rear room of the store, Parnell met with Lewis, Thomas, Williams and Carlton Darden. Lewis advised Parnell that Lewis knew of Parnell's ability to supply cocaine to entertainers. Lewis offered to supply Parnell with cocaine, "whatever I needed." Lewis provided Parnell with a pager number to be used to reach Ronnie Thomas and other Lewis associates. Parnell tried this new cocaine source several times, buying quarter-ounce amounts. Parnell would deliver his payment later to Lewis. After several transactions, Lewis told Parnell that his credit was good and Parnell continued to get cocaine from Lewis (Tr. 28, pp. 198-201).

## IV. OCTOBER 1985: MURDER OF DEPUTY SHERIFF TIARI

On February 29, 1984, Jerry Lewis signed a one-year lease on behalf of the MSTA, renting--for $450 a month--the first floor of

a building at 3600 North Grand in St. Louis, for the Temple's "business and worship purposes." The lease ran from June 1, 1984 through May 31, 1985. The lessor was Antar Tiari, a St. Louis deputy sheriff acting on behalf of his splinter religious group which owned the building under its corporate name (Fahamme Temples of Lillahi Ra World Headquarters, Inc.) (Govt. Ex. 40, 47).

Publicity from the Young murder came at about the same time as the termination of a government agency (CDA) contract with the MSTA which Jerry had obtained from City Hall, purportedly to provide "social services" (Govt. Ex. 46; Tr. 16, pp. 27-67). Tiari declined to renew or extend the MSTA's lease and, through an attorney, instituted eviction proceedings against the MSTA in St. Louis Circuit Court. Tiari won an eviction order on October 4, 1985, and was to return to Court to finalize the process on or about November 1, 1985 (Govt. Ex. 47; Tr. 15, p. 309 et seq.)

In about September 1985, Bennett, Jerry Lewis, Gerald Hopkins, and Parnell met at a restaurant. Bennett said that Lewis had been paying "the sheriff" (Tiari) $5,000 rent on the temple and Lewis was complaining, as this was when Tiari was trying to evict the MSTA (Tr. 28, p. 206). On October 31, 1985, Bennett called Parnell and said, "Jerry and them needed to take care of that thing . . . " (Tr. 28, p. 208). Parnell and Bennett drove to Andrew's Auto Care and met Jerry Lewis and Gerald Hopkins. All planned the killing of "the sheriff" (Tiari), and discussed when Tiari would arrive at his home (located above the disputed temple quarters in the 3600 Grand building). Parnell and Bennett left, with Parnell

25

going to acquire an Uzi and another pistol. After getting the guns, Parnell again picked up Bennett and they returned to Andrew's Auto Care. Lewis and Gerald Hopkins were there, wearing military fatigues. Showing its operation to Lewis and Hopkins, Parnell provided the Uzi to them. Hopkins put it inside his fatigues. In two cars, the foursome drove to the area of 3600 North Grand. According to the plan, Lewis was to wait in the alley while Hopkins shot Tiari. It was early evening. In a back-up role, in case something went wrong, Parnell and Bennett parked on a fast food restaurant lot across and to the side of the building and saw Lewis pull into the alley in a green Chrysler-make car. After a wait, Parnell started for the restaurant, but then heard several shots, looked and saw the victim's body on the MSTA building's steps. He and Bennett left and put their guns back in their car's hiding spots. Later, they returned to Andrew's shop, after driving by the shooting scene and seeing that police had roped the area off. Perhaps 15-20 minutes later, Lewis and Hopkins arrived at the shop. They discussed changing the barrel on the Uzi and Lewis said that he'd given the gun to Michael Williams to get rid of and that he would also give Williams the green car (a Dodge Swinger) used that night. Hopkins described how he had repeatedly shot Tiari, and Lewis chimed in saying, "You're my little hitman" (Tr. 28, pp. 205-216). Officers called to the shooting scene found Tiari already dead, shot repeatedly in the head and arm from behind, with his keys still in the lock of the door he had been attempting to enter. (Govt. Ex. 48A-I).

That being Halloween, the MSTA had sponsored a children's party upstairs in the Temple building; the party was going on at the time of Tiari's murder. Several adult MSTA members were at the party, including Michael Lewis, Jerry's brother. Interviewed by homicide detectives that night, Michael Lewis stated that Jerry was out of town, in Washington, D.C., had been for two days, and was not to return for a few more days. In fact, still later that evening and unaware of Lewis' role in the murder, SLMPD narcotics Dets. Beck and Ranciville saw Lewis and two others (Lewis and one of the others in military fatigues), standing by a car on a service station parking lot in north St. Louis. The three drove off the lot in a green Dodge Swinger. (Tr. 17, pp. 180-235).

On November 4, 1985, Lewis' attorney sent police a letter specifying the dates and two places where Lewis supposedly stayed, as well as his air travel times. No supporting records were found at the first hotel, however (Tr. 17, pp. 88-91), and at the second lodging the registration folio was signed by someone other than Lewis.[13] (See, generally, Tr. 16, p. 113, et seq.; Tr. 17, pp. 102-235; Tr. 28, pp. 205-218. Later, Michael Lewis Bey heard his brother and a drug associate, Randy Bey, discuss how the phony hotel alibi documents were created (Tr. 54, p. 26-28, 34).

---

[13] Records obtained from an Alexandria, Virginia, hotel showed a "Jerry Lewis Bey" as occupying a room there beginning on November 1, 1985, through November 2, 1985 (Tr. 16, pp. 145-153). However, as a handwriting expert noted at trial, the hotel's folio card bears a signature appearing quite different from Lewis' distinct, fluid style (Tr. 17, p. 102-113).

27

Michael Lewis himself had become an active cocaine distributor by this point and knew who received and distributed the group's cocaine. He was present at cocaine-related discussions between his brother Jerry and Richard Hopkins and between Jerry and Noble Bennett. (Tr. 3/15/93, pp. 18-68).

He had twice seen Jerry's primary supplier, "Johnny," and had participated in the receipt and movement of cocaine that "Johnny" had brought to town. (Tr. 54, pp. 57-73). On an occasion, Michael even located some cocaine from a different source and got it to Jerry for redistribution (Tr. 54, pp. 205-211), and knew that Jerry had alternate cocaine sources, used when, for example, Johnny was in jail. (Tr. 54, p. 219).

In late September 1990, after Jerry had been alerted that an investigation of his activities was underway, Jerry, Rudy, Michael, Michael Williams and others took a trip to Detroit, ostensibly to celebrate Williams' birthday. Michael Lewis later learned that the trip was an effort to be out of town when one of Jerry's sons, Marcus "Little Mark" Lewis, was to kill Fred Knox to prevent him from supplying information to authorities. The murder, however, didn't occur when the group was out of town. (Tr. 54, pp. 234-239).

Instead, Michael Lewis learned of the Knox killing on the day it happened, when Michael came to the Family Market (over which he lived) and saw Jerry and Little Mark in the back office. Jerry was trying to break down a .380 pistol. Mark told them how he'd just done the killing. Jerry wanted to make sure that Mark had left Knox dead. Soon, Michael Williams came by in a city truck (he

80

worked for the city) and took the broken-down parts of the gun, putting them in a paint can to dispose of them. (Tr. 54, pp. 241-248).

When the January 9, 1991, search warrants were served, Michael, Jerry and other key enterprise members were arrested. They later learned that the searching officers had missed finding drug money, stored in bank bags in Michael's attic. Jerry, who had had access to Michael's apartment for years, would keep money or other items there. This stash of several hundred thousand dollars, Jerry told Michael, would still be available. After the arrests, Michael's wife (Cynthia) and Jerry's wife (Tonya) went to the apartment and retrieved the bank bags of money. Afterward, Jerry arranged for payment of thousands of these dollars to Michael's initial defense attorney in this matter. (Tr. 55, pp. 3-14).

As Michael, in jail awaiting trial, thought of how his involvement was relatively lesser than his brother's and many of his codefendants and of how the activities of his brother had hurt a religious/social movement that Michael still believed in, he ultimately decided to cooperate with authorities. His brother, apparently feeling this was coming, wrote letters to Michael urging that he maintain loyalty, essentially pleading with Michael not to cooperate. (Tr. 55, pp. 16-37). However, Michael Lewis Bey, like other cooperating codefendants, provided extensive detailed trial testimony, explaining specific instances and the overall picture of the enterprise's recurring pattern of drug dealing, murders,

automatic pistol. (Caldwell had been in prison from the early to the late '80's; during that period he had linked with the MSTA, becoming a "prison Moor" and upon release continuing the association as a "street Moor.") The serial number on the seized Uzi was found to match the Uzi that Lewis' wife, Tonya Brown, had registered as purchasing on October 31, 1984, and which she had reported stolen from the Family Market in 1986. (Tr. 49, p. 55, et seq.; Govt. Ex. 325).

Caldwell began to cooperate with authorities and revealed, inter alia, his and others' recent on-going involvement in the JLO's business of drug dealing and planned murders. He provided specifics about early November, 1990, cocaine transactions involving himself, Michael Shepherd, Jerry and Michael Lewis, Michael Williams, Rudy Weaver and a hispanic guy, "Johnny," among others. Caldwell provided details about the group's recent multi-kilo and multi-ounce dealings, as well as about on-going plots to kill Lorenzo Petty (a rival), two possible informants, and Lewis' seeking to interest Caldwell in killing a prosecutor for $50,000 and a passport. Caldwell explained how Michael Williams had obtained a .380 pistol to use in killing Fred Knox, who had been subpoenaed to the federal grand jury. After Caldwell's gun arrest, his associates wouldn't deal cocaine with him, but Caldwell did tape corroborative conversations he had with Shepherd. (Tr. 49, pp. -150).

# VII.

## THE TRIAL COURT PROPERLY ADMITTED DOCUMENTS SEIZED IN WARRANTS EXECUTED AT RESIDENCES OF ENTERPRISE PARTICIPANTS

Several defendants assert that the trial court erred in admitting a number of documents seized from residences and premises associated with defendants in this case.[47] Because these exhibits were offered as evidence for important purposes other than the truth of the matters reported in them, no error occurred.

During the course of investigation of the enterprise, search warrants were executed at several locations. Particularly, on January 9-10, 1991, a number of searches, pursuant to warrants, occurred, including searches of residences of defendants. A wide assortment of items were recovered, including weapons, photographs, scrapbooks and various documents. Appellants attack the admission of materials seized in the execution of these warrants. (Exhibits 352, 449, 459, 460c, 463, 471, 474, 490, 499, 525, and 587). The bulk of these exhibits were seized from 12654 Stoneridge, Jerry Lewis' residence at the time of the indictment, and 5088 Emerson, a Lewis family residence where Jerry Lewis stored a volume of personal materials. Their arguments fail because, in attacking these exhibits, defendants misstate the purpose for which they were admitted into evidence. These exhibits, which included scrapbooks

---

[47] This issue is discussed specifically in the briefs of appellants Darden (issue 5, p.62), Hopkins (issue 9, p. 62), Bennett (issue 8, p. 117), and in Hopkins pro se brief (issue 2, p. 3). Appellant Seals adopts the argument of Darden and adds a related argument concerning exhibit 371, a photo, seized from Seals residence, of a large sum of money. Appellants Williams (issue 6) and Amerson (issue 6) also adopt Darden's argument.

of news accounts, police investigative materials and other materials connected with the criminal problems of the defendants and others, were not admitted for the accuracy of the matters discussed in them, but rather for the often significant fact that the defendants accumulated, saved, and had in their possession the documents themselves.

Under the RICO statute, a basic element which must be proved in a RICO prosecution is that the charged members of the enterprise were "associated in fact". Title 18, United States Code, Section 1961(4). See, United States v. Bledsoe, 674 F.2d 647 (8th Cir.), cert. denied, 459 U.S. 1040 (1982); Ocean Energy II, Inc. v. Alexander & Alexander, Inc., 868 F.2d 740, 749 (5th Cir. 1989) ("association in fact is lynchpin of enterprise status"). In fact, the jury charge in this case explained that the government had to prove an association of the defendants. Instruction No. 12. As this trial unfolded, this "association" of Jerry Lewis with his co-conspirators was a significant issue as he attempted to disassociate himself from them, testifying and implying in cross-examination that he had little relationship with them (e.g., Tr. 77, pp. 9-10, 12, 32, 37, 50, 62-63, 68, 122, 144; Tr. 79, pp. 23, 85, 115, 135; Tr. 80, pp. 201-02). The newspaper articles, photographs, police reports and law enforcement memoranda, compiled and saved by Lewis, in which his co-conspirators are consistently featured, provided graphic evidence of his strong association with and avid interest in the fates of many of these people. Indeed the testimony of the investigating officers and agents make clear that

172

showing this association was a significant reason why these items were seized as evidence (Tr. 2, p. 67; Tr. 3, pp. 58, 77, 79, 93). The government does not maintain that this tangible evidence is sufficient evidence of the existence of an enterprise under RICO when considered in isolation. However, when considered with the other evidence, particularly the testimony of participants as to the membership and structure of the enterprise, materials of this nature, largely concerning members of the enterprise--seized from the participants themselves (including the leader of the organization)--provide significant corroboration of that testimony.

Another significant purpose of much of the evidence appellants claim to be improper was to show that members of the enterprise, and Jerry Lewis in particular, were avidly interested in accounts-- including newspaper clippings and confidential police reports, of law enforcement investigations into the St. Louis drug trade, especially those involving Lewis, Bennett and their associates, as well as investigations and events involving their competitors in that business. Such information would serve an obvious purpose to the leaders of such a criminal organization as they tracked the identity and activity of both those who would bring them to justice and their very deadly rivals. As these items were identified at trial by witnesses involved in the seizures, it was repeatedly explained that this intelligence and counter-intelligence gathering was the reason these items were seized. (Tr. 2, pp. 67, 76, 77, 88; Tr. 3, pp. 127, 133, 146).

Additionally, the defendants' co-racketeers testified how they had reviewed these collections of information with Jerry Lewis (e.g., Tr. 8, pp. 282, 285-288), who advised that such accumulations of information ". . . give him some kind of insight on who he's got to get rid of, who's coming, where they some kin to, things of this nature" (id.).

In one particularly ominous indication of the desire of these people to identify and track their "enemies", whether police or other criminals, copies of identification of Sgt. Salvatore Cira, a lead investigator in this case, were found hidden in a toilet tank at Noble Bennett's residence (Tr. 4, p. 177). It is unsurprising that people who murder competitors and commit a wide array of crimes would feel a strong need to monitor the threat to them posed by rivals and the police. It is the mere fact that the defendants felt compelled to compile such material, and not the actual accounts contained in the documents, that gives these exhibits their significant probative value. In light of this purpose, hearsay rules are not implicated as the exhibits were not offered for the "truth of the matter asserted" in the documents. Rule 801(c), Federal Rules of Evidence. The cases cited by appellants for the proposition that newspaper accounts and police reports should not be admitted concern situations where, unlike here, the materials were being offered for the purpose of proving the events asserted in the articles and accounts. Such was not the purpose in this case and those cases are inapposite.

## CONCLUSION

Therefore, for each and all of the aforesaid reasons, the sentence and judgment of the District Court should be affirmed.

Respectfully submitted,

EDWARD L. DOWD, JR.
United States Attorney

MICHAEL K. FAGAN
MARY JANE LYLE
DEAN R. HOAG
DANIEL E. MEULEMAN
SAM C. BERTOLET
Assistant United States Attorneys

1114 Market Street, Room 421
St. Louis, Missouri 63101
(314) 539-6851

Attorneys for Appellee

May 15, 1995