# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **JERRY LEWIS BEY,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 05-2241 (JGP)** |
| **v.** | ) | |
| | ) | |
| **U.S. DEPARTMENT OF JUSTICE,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

# Def. Exh. NNN

**FILED**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

NOV 2 7 2000

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO

UNITED STATES OF AMERICA,  )
                           )
    Plaintiff,             )
                           )
vs.                        )  No. S1-91-0001CR(6)
                           )
JERRY LEE LEWIS,           )
MICHAEL WILLIAMS EL,       )
CARLTON DARDEN BEY, and    )
RAYMOND AMERSON BEY.       )
                           )
    Defendants.            )

### <u>ORDER</u>

This closed criminal case is before me on a variety of motions filed by

defendants Jerry Lewis Bey, Michael Williams El, Carlton Darden Bey, and

Raymond Amerson Bey. The motions allege that these four defendants were

convicted and sentenced to life imprisonment based on prosecutorial misconduct

including the knowing use of false testimony and violations of <u>Brady v. Maryland</u>,

373 U.S. 83 (1963). I have carefully reviewed the voluminous file in this case,

and have carefully considered the defendants' arguments. I conclude that the

defendants have not shown any basis for relief from their convictions or sentences,

or any basis for a new trial. Because I further conclude that these motions were, in

essence, motions to set aside or vacate convictions under 28 U.S.C. § 2255, and

should have been denominated as such, I will deny a certificate of appealability.

## I. Background

### A. The Trial and Convictions

In June of 1993, following a nine-month trial, seven defendants in this case were convicted of violating the Racketeer Influenced and Corrupt Organizations Act (RICO). All four of the defendants who bring motions here were convicted of one count of conducting an enterprise through a pattern of racketeering activity and one count of conspiring to do the same. Two defendants, Jerry Lewis Bey and Raymond Amerson Bey, were also convicted of multiple counts of using violent crime in aid of racketeering (involving murder and murder conspiracy). All four defendants were sentenced to life imprisonment.

For each of the RICO convictions, the jury specifically found that the government had proven beyond a reasonable doubt that each defendant had committed numerous RICO predicate acts. All four were found to have committed acts of narcotics trafficking and conspiracy. The jury found the government had proved that Jerry Lewis Bey committed twenty-nine predicate acts, including seven murders and four attempted murders. Raymond Amerson Bey's eighteen proven predicate acts included three murders and three attempted murders. Carlton Darden Bey's proven predicate acts included conspiracy to murder and attempted murder involving two different victims, neither of whom

-2-

was actually killed, while Michael Williams El was proven to have been involved in two completed murders. Lest it appear that the jury simply rubber stamped the prosecution theory, it should be noted that the jury deliberated for twelve days (following 100 days of trial), found two of the co-defendants not guilty of all charges, and even as to these four defendants found the government had failed to prove several of the charged predicate acts.

The convictions were affirmed on appeal. <u>United States v. Darden,</u> 70 F.3d 1507 (8th Cir. 1995). As the Eighth Circuit noted, the evidence showed that Jerry Lewis Bey lead an organization which controlled a significant portion of the St. Louis market for illegal drugs (Ts and Blues, heroin, and cocaine) for a period of more than ten years. Lewis Bey controlled a "long-term, violent drug-trafficking enterprise," which engaged in murders and other violent acts and which hid behind "a facade known as Subordinate Temple No. 1 of the Moorish Science Temple of America." 70 F.3d at 1516. The Court of Appeals held that the government had produced "overwhelming evidence" of the defendants' guilt, 70 F.3d at 1530, and that there was more than sufficient evidence from which the jury could find that defendants conspired to and did engage in RICO violations. The Court overruled various defendants' objections to the "enterprise" element, the predicate acts, and the pattern of racketeering activity.

- 3 -

Not surprisingly, the government investigation into this organization
covered many years and many witnesses, and much of the evidence at trial was
provided by cooperating members of the organization who had entered into
agreements with the government. Among others, those witnesses included Rudy
Weaver, Ronnie Thomas, Earl Parnell, Michael Shepherd Bey, and Michael Lewis
Bey, who was the brother of Jerry Lewis Bey.

These key witnesses testified that they were intimately involved with the
operation of the Jerry Lewis Bey organization. Thomas admitted committing
multiple murders as part of his job as "security" for the organization. Shepherd
Bey and Weaver testified to extensive drug activities, as well as their participation
in murder conspiracies. Parnell testified about murders and drug distribution.
Michael Lewis Bey testified about murders and drug deals as well. The witnesses
all had long associations with Jerry Lewis Bey and the other defendants, and many
of them testified for many days, and were subjected to cross-examination by
multiple defense counsel. For example, Ronnie Thomas testified on direct for
three days, and was cross-examined for four full days. Earl Parnell's testimony
also stretched over seven trial days. Michael Lewis Bey, Michael Shepherd Bey
and Rudy Weaver each testified for approximately four days, with cross
examination taking over half of their trial time. Witnesses George Noel and Kerry

- 4 -

Caldwell also testified for lengthy periods and were subjected to lengthy cross examination. Although there were some inconsistencies among the testimony of the cooperating witnesses, in general they all told very similar stories, and implicated Jerry Lewis Bey, Raymond Amerson Bey, Carlton Darden Bey, and Michael Williams El not only in drug dealing but also in murders and conspiracy to commit murders.

Of course, there were numerous other witnesses presented during the trial, including other associates of the defendants and many law enforcement officers. As the Eighth Circuit said, the evidence of these four defendants' guilt was overwhelming.

The cooperating witnesses were each questioned extensively about their agreements with the government. Most of the witnesses had cooperation agreements which involved pleas to the first RICO count of the indictment, and agreements that the government would recommend a certain sentence but would file a motion for downward departure for substantial assistance to allow the Court to depart below the recommended sentence. Kerry Caldwell, George Noel and Earl Parnell were not charged in the indictment, although Kerry Caldwell pleaded guilty to a gun charge and had already completed his sentence at the time of his testimony. The cooperating witnesses testified that they and/or their families had

- 5 -

been placed in or offered to be placed in the Federal Witness Protection program,
at great expense to the government. The jury heard that certain of the witnesses
had been given money by the government (for example, Earl Parnell had received
a $13,000 "reward" for his assistance in a prior seizure matter, and Kerry Caldwell
received over $5,000 from the FBI and DEA).

Additionally, the cooperating witnesses were extensively cross examined
regarding their own prior criminal behavior. Ronnie Thomas Bey and Michael
Lewis Bey admitted committing perjury in prior court proceedings. Thomas also
testified in grisly detail about murders he had committed and his potential bias
against defendants. Shepherd Bey admitted problems with alcohol and drug use
and many parole violations. Parnell, Weaver, Noel, and Caldwell testified to
numerous criminal acts involving drug dealing and violence, including murders
and/or murder conspiracies.

**B. The Post-Trial Motions**

**1. Procedural History**

Jerry Lewis Bey filed a motion for new trial based on newly discovered
evidence in June of 1995, while the case was still on appeal, and supplemented
that motion several times. The Court denied the motion in February of 1996.
Some of the issues he raises here were raised in those earlier motions and

- 6 -

overruled, and others are new.

In January of 1997 "Defendants' Joint Motion to Vacate Judgments of

Convictions and to Dismiss, or in the Alternative Motion for a New Trial" was

filed, purportedly on behalf of four defendants.   The motion was signed by Anita

Rivkin-Carothers, as attorney for Michael Williams El, and purportedly on behalf

of Carla Seals and the attorneys for Jerry Lewis Bey and Noble Bennett. Carla

Seals later testified that she never joined in or authorized her name being used on

this motion, and she has explicitly withdrawn from it. Noble Bennett later filed

his own separate motion under 28 U.S.C. § 2255, which superseded the claims he

purportedly made here, and which has been ruled on separately in Case No.

4:97CV757 ERW.

Later in 1997, defendants Carlton Darden Bey and Raymond Amerson Bey

filed separate submissions joining in the "joint" motion, and adding additional

claims. Jerry Lewis Bey filed his own motion, along with several supplements

and addenda to his motion, some through an attorney and some pro se. The

government filed a consolidated response, which also included its response to the

separate §2255 motion filed by defendant Gerald Hopkins Bey.  The Hopkins Bey

matter has been separately ruled upon in Case No. 4:97CV958 ERW.

Because the Hopkins Bey and Bennett motions have been ruled on in

- 7 -

separate cases, and because Carla Seals has disclaimed filing any motion, the only

motions remaining before me are brought by Jerry Lewis Bey, Michael Williams

El, Carlton Darden Bey, and Raymond Amerson Bey. The various motions are

called various things, and claim to seek relief under Rules 29 and 33 of the Federal

Rules of Criminal Procedure, as well as seeking the relief that their convictions

and sentences be vacated and set aside and that the charges against them be

dismissed. Although none is captioned as a motion under 28 U.S.C. § 2255, and

although the Clerk of Court did not docket them as separate civil actions under §

2255 because they were not denominated as such, they all should be considered as

§2255 motions, since most of the relief they seek could only be granted under that

statute. Because the various motions, no matter what they are denominated, all

join in and refer to one another and make related or duplicative arguments, and

for administrative ease, I will leave them in the criminal file and rule on the merits

in this one order.

### 2. Arguments

The motions are based in large part on the alleged recantation of Michael

Lewis Bey, which is contained in an affidavit signed with the initials "MLB." In

this affidavit, MLB states that he is one of the defendants in the case who pleaded

guilty and testified, but is using his initials because he fears reprisal from the

government should his identity be revealed. Michael Lewis Bey is, of course, the
only defendant who meets the description in the affidavit. The affidavit states
that MLB was instructed by the prosecutors to be "creative" in his testimony; and
that he repeatedly told the government agents "that I was never involved in any
aspects of anybody's drug business." He states that he was told by the
government he should say he was involved in the drug business "in order to make
me more believable." MLB says he was promised he would "not do more than 1,
2, 3 or 4 years," but should not disclose that fact. He also says that he heard
Ronnie Thomas Bey and Michael Shepherd Bey discussing which murders to "put
on" which defendants, that he, Shepherd Bey and Thomas were given polygraph
tests, and that he and the other cooperating witnesses were given special favors
including conjugal visits with their wives, collect calls to their families and friends
at the government's expense, and special meals. He also avers that Shepherd Bey
was using drugs while incarcerated.

    Defendants also rely on testimony some of these witnesses gave at later
state or federal proceedings, which defendants say show inconsistencies or
undisclosed favorable treatment by the government. For example, Kerry Caldwell
testified in a state deposition that he was involved in more murders than he
testified to in this trial. Michael Lewis Bey testified in a deposition that he was

given a polygraph in early 1992. Rudy Weaver testified that a year and a half or
two years before the trial he was given a "honeymoon" and a "couple" of conjugal
visits. Ronnie Thomas Bey testified in a deposition that he never took Kerry
Caldwell to Jerry Lewis Bey's house and that he didn't tell Caldwell that he was
going to kill Robert Young (both of which conflict with Caldwell's trial
testimony).

Defendants argue that the government engaged in misconduct and failed to
produce documents and other evidence to which they were entitled under Brady.
Making other arguments about inconsistencies, defendants argue the government
presented perjured testimony both before the grand jury and at trial.

The government's consolidated response attaches as exhibits, among other
things, affidavits from various prosecutors, deputy U.S. Marshals, and law
enforcement officers who state that while the cooperating witnesses were in their
custody they did not leave them alone with their wives and did not allow them to
have sex, and did not provide any other unusual benefits or benefits that were not
disclosed through cross examination. The prosecutors' affidavits deny knowing of
sexual activity or of any other claimed improprieties. The government also
attaches an affidavit by Rudy Weaver where he denies having sexual contact with
his wife while in custody. Additionally, an affidavit by Michael Shepherd Bey

- 10 -

contradicts most of the allegations of MLB's affidavit and that of Jerry Lewis Bey,

and adds that sometime after the trial he was contacted by Michael Lewis Bey,

who told him he was engaged in continuing criminal activity and was trying to get

back in the good graces of his family and the Moorish Science Temple.

## II. Legal Standards

Rule 29, Fed. R. Crim. P., on which defendants claim their motions are

based, in part, allows for a motion for judgment of acquittal to be made or

renewed within seven days after the jury is discharged. These motions were made,

at the earliest, more than a year after the Court of Appeals affirmed the judgment,

and almost four years after the jury returned its verdict. Clearly, there is no basis

for relief under Rule 29.

Defendants also rely on Rule 33, Fed. R. Crim. P. That rule allows a court

to grant a new trial if the interest of justice so require, and provides time limits for

seeking a new trial. Although any request for Rule 33 relief is time barred as well,

I will consider the merits of these motions in the interests of justice. For

defendants to obtain a new trial based on newly discovered evidence, they "must

put forth material evidence, not merely cumulative or impeaching, that came to

light subsequent to trial and would probably produce an acquittal." U.S. v.

Daniele, 931 F.2d 486, 488 (8th Cir. 1991). "Additionally, the court must be able

- 11 -

to infer diligence from the facts alleged." Id.  Even if the Rule 33 motions had

been timely, they would be denied because the evidence presented here is not

"new," it is, at best, impeaching, it is cumulative, and it would not have probably

produced an acquittal.

As set out above, I believe that most of the arguments raised here would be

most appropriately raised on a motion to vacate or set aside conviction under 28

U.S.C. § 2255, and so I will consider them as if they had been so raised.  To

recover under § 2255, of course, defendants must show that their convictions or

sentences were imposed in violation of the Constitution or laws of the United

States.  Defendants essentially argue that they were denied due process because of

prosecutorial abuse, use of false testimony, and violations of the government's

discovery obligations.  Of course, under any rule or theory, defendants cannot

raise issues here that they could have raised on direct appeal.

Due process requires the prosecution to disclose evidence favorable to the

accused.  Brady v. Maryland, 373 U.S. 83 (1963).  This includes not only

information exculpatory to the defendant but also information that could be used

to impeach the government's witnesses.  Giglio v. United States, 405 U.S. 150

(1972).  Neither Brady nor Giglio, however, require the government to produce all

of its investigative files or to produce evidence that is not exculpatory or

- 12 -

impeaching. See, e.g., U.S. v. Sumner, 171 F.3d 636, 637 (8ᵗʰ Cir. 1999).

Due process does not require that a conviction be reversed when the alleged
Brady violation relates to evidence that is not material. In United States v. Bagley,
473 U.S. 667, 682 (1985), the Supreme Court defined materiality in this context to
mean that there is a reasonable probability that disclosure of the evidence would
have changed the outcome.   In Kyles v. Whitley, 514 U.S. 419 (1995) the Court
stated:

> Bagley's touchstone of materiality is a "reasonable probability" of a
> different result, and the adjective is important. The question is not
> whether the defendant would more likely than not have received a
> different verdict with the evidence, but whether in its absence he
> received a fair trial, understood as a trial resulting in a verdict worthy
> of confidence.

514 U.S. at 434. More recently, in Strickler v. Greene, 119 S.Ct. 1936 (1999), the
Court stated:

> There are three components of a true Brady violation: The evidence at
> issue must be favorable to the accused, either because it is
> exculpatory, or because it is impeaching; that evidence must have
> been suppressed by the State, either willfully or inadvertently; and
> prejudice must have ensued.

119 S.Ct. at 1948. Defendants have the burden of showing, on a motion such as
this, that "the favorable evidence [withheld] could reasonably be taken to put the
whole case in such a different light as to undermine confidence in the verdict."
Kyles, 514 U.S. at 435.

- 13 -

Prosecutors have a duty not to present perjured testimony to the jury, and to correct testimony that they know is false. See e.g., Napue v. Illinois, 360 U.S. 264, 269 (1959). However, even if false testimony is offered, a case will not be reversed unless there is a reasonable likelihood that the outcome of the trial would be affected. See e.g., United States v. Goodson, 165 F.3d 610, 615 (8th Cir. 1999). In order to prove prosecutorial use of false testimony, the defendants must establish: "(1) the prosecution used perjured testimony; (2) the prosecution knew or should have known of the perjury; and (3) there is a reasonable likelihood that the perjured testimony could have affected the jury's judgment." United States v. Payne, 119 F.3d 637, 645 (8th Cir. 1997). Mere inconsistencies in testimony are insufficient to establish prosecutorial use of false testimony. United States v. Jordan, 150 F.3d 895, 900 (8th Cir. 1998).

For a convicted defendant to challenge an indictment based on grand jury misconduct, he must show that intentional misconduct "influenced substantially the grand jury's decision to indict," or otherwise rendered the proceedings fundamentally unfair. Bank of Nova Scotia v. United States, 487 U.S. 250, 259 (1988). Even when the allegation is that the grand jury heard perjured testimony, the defendant must still show prejudice before an indictment will be dismissed. United States v. Soberon, 929 F.2d 935, 939-40 (3rd Cir. 1991). Moreover, the

- 14 -

Supreme Court has held that a trial jury's guilty verdict "rendered harmless any

conceivable error in the charging decision that conceivably flowed" from grand

jury misconduct. United States v. Mechanik, 475 U.S. 66, 73 (1986). This

holding has been applied not just to technical grand jury rule violations, but also

to allegations of perjury. See e.g., United States v. Morrison, 153 F.3d 34, 55 (2nd

Cir. 1998); United States v. Kouba, 822 F.2d 768, 773 (8th Cir. 1987).

### III. Discussion

Even defendants do not claim that any of the allegedly withheld or newly

discovered evidence is actually exculpatory to them. For example, Jerry Lewis

Bey claims that the government improperly withheld a tape recording of an

interview his ex-wife, Doris Lewis, provided to a prosecuting attorney. Although

the government thinks it produced the tape, even if it did not, there would be no

constitutional violation, because even the portions of the transcript of the tape

which Lewis Bey attached to his motion are extremely incriminating to Jerry

Lewis Bey. On the partial transcript Doris Lewis describes Jerry's heroin and

cocaine dealing and implicates him and his associates in several murder

conspiracies. Doris Lewis was not called to testify at trial, and nothing on this

tape is exculpatory. Similarly, although defendants point to alleged

inconsistencies in the later deposition testimony of Ronnie Thomas, Kerry

- 15 -

Caldwell, and others, those witnesses continued to implicate the defendants here in numerous acts of drug trafficking, violence, and murder or murder conspiracies.

I do not believe that MLB's affidavit creates any real issue requiring either a new trial or even an evidentiary hearing. Courts do not look favorably upon recantations by material witnesses. See, e.g., U.S. v. Papajohn, 212 F.3d 1112, 1117 (8th Cir 2000); U.S. v. Grey Bear, 116 F.3d 349, 350 (8th Cir. 1997); United States v. Provost, 969 F.2d 617 (8th Cir. 1992). Cf. Lewis v. Erickson, 946 F.2d 1361 (8th Cir. 1991)(granting habeas corpus where adult rape victim recanted identification testimony). Here, Michael Lewis Bey is the brother of defendant Jerry Lewis Bey, and it is easy to expect that family pressure would be brought on him to recant his testimony, especially since he has completed serving his own sentence. His testimony at trial was extremely detailed, and, more importantly, was corroborated in very significant respects by other witnesses and other evidence. The convictions in this case were not based on one witness's testimony, but rather were based on the mosaic of interlocking evidence of many, many witnesses. The only specific testimony that the MLB affidavit alleges was false was that MLB now says he "was not involved in anybody's drug business," where at trial he provided detailed descriptions of his and others' involvement in the drug business. His other allegations are simply that he expected a sentence lower than

- 16 -

fifteen years (which does not conflict with his trial testimony), that he was told to be "creative" and that he testified to "many facts" that were not true. These vague allegations are not sufficient to contradict his very significant and detailed testimony, which was corroborated in numerous respects by other witnesses.

Defendants argue, however, that the evidence could have been used to impeach the cooperating witnesses who testified against them. They rely on much of this same evidence to argue that the government knowingly produced perjured testimony. They essentially argue that when the cumulative effect of all of the "governmental misconduct" is considered, they were denied the fair trial guaranteed by the due process clause.

### 1. Polygraphs

Defendants claim that government witnesses Michael Lewis Bey, Michael Shepherd Bey, Kerry Caldwell and Ronnie Thomas Bey were given polygraph tests by the government and that the results of these tests were not produced, in violation of <u>Brady</u>. In response, the government alternatively argues that it doesn't think these witnesses were given polygraph tests before their testimony, and that even if they were the results did not show any deception on the part of the witnesses. The government argues that any polygraph tests that may have been done would have been done by the United States Marshals Service in preparation

- 17 -

for the witnesses' admission to the Witness Protection Program, and thus most

likely followed their testimony. The government has presented affidavits

establishing that none of the witnesses were deceptive on any polygraph

examinations.

From the competing affidavits and arguments, it appears to me that the

witnesses may, in fact, have been given polygraph tests before they testified,

whether for purposes of the witness protection program or for law enforcement

purposes. Even the witnesses who claim to have been given such tests, however,

do not say that the tests indicated they were being deceptive, and the government's

affidavits all state that no government agent was ever told that any witness had

answered deceptively. If they were not being deceptive, then the polygraphs could

not be considered favorable to the defendants, and were not required to be

produced in any event. The Supreme Court has held that a defendant is not

necessarily entitled to relief even if he shows that the government failed to reveal

that a government witness has failed a polygraph test. Wood v. Bartholomew, 516

U.S. 1, 8 (1995). Here the results of the polygraph would not have been

admissible by either side, and it is hard to believe that the defense counsel would

have taken any different actions in preparing their cases had they been told of any

deception. I find that even if polygraph tests were given to these witnesses, the

- 18 -

government did not violate <u>Brady</u> by failing to disclose them.

### 2. Conjugal Visits, Drugs and Telephone Calls

Defendants argue that witnesses Michael Lewis Bey and Rudy Weaver
were allowed to have sex with their wives during the time they were incarcerated
before trial, and were given special treatment including free telephone calls and
special meals. Defendants argue that the failure to disclose this "benefit" of their
cooperation violated <u>Brady</u>. The government argues that defendants are simply
fabricating evidence in an attempt to bring this case within the framework of the
disastrous "El Rukn" prosecution in Chicago.

The problems with the "El Rukn" case are described in <u>United States v.
Boyd,</u> 55 F.3d 239 (7th Cir. 1995) and in the trial court's opinion affirmed by that
case, and in several other reported decisions referenced therein. There the trial
court granted a new trial because the government's cooperating gang member
witnesses lied under oath and, while incarcerated, "received a continuous stream
of unlawful, indeed scandalous favors" from the prosecutors, which were not
disclosed to the defense. 55 F.3d at 244. These favors included witnesses
repeatedly being allowed to use drugs and have sex at the United States Attorneys'
offices, and to "roam about in government offices unsupervised to steal numerous
documents." The government witnesses not only used drugs while incarcerated,

- 19 -

they received drugs while in the prosecutors' custody which they then sold to other inmates. They also developed close, personal relationships with the prosecutors and their staff, which included, among other things, gifts, contraband and "phone sex." Additionally, they testified falsely about all this misconduct, telling the jury that they were not then using drugs, and that, as the Circuit put it, they had "seen the light" and reformed their former ways. Applying a very deferential standard to the trial judge's decision, the Court of Appeals affirmed the grant of new trial, finding that had the jury known that the witnesses were lying about their current drug trafficking and use, it might have reached a different conclusion.

Nothing in the El Rukn case states that a new trial must be granted whenever a government witness is later shown to have used drugs or had sex, as defendants seem to argue here. In Boyd the Court of Appeals simply held that the trial judge, having viewed the evidence and testimony, did not abuse his discretion in granting a new trial. The Seventh Circuit in no way indicated that the trial judge could only have reached that result. Instead, the Court of Appeals did the opposite, and suggested several times in its opinion that it might have ruled differently in the first instance. Most importantly, the conduct in this case, even assuming that all of the defendants' allegations are true, is not even close to that

- 20 -

which occurred in the El Rukn case.

The government here denies that the witnesses were allowed to have sex while in custody, although it admits that they were given the same "contact" visits with their family members that other prisoners are routinely allowed. Rudy Weaver has filed an affidavit stating that although he was allowed "conjugal visits," these did not involve sex. Even assuming that Michael Lewis Bey was somehow allowed to have sex with his wife, as his affidavit alleges, the government's failure to disclose this evidence would not have affected the outcome of the trial for any of the defendants here.

Similarly, the argument that some of the witnesses were given special telephone privileges and Kentucky Fried Chicken or other "special" meals while in custody carries little weight, and I cannot believe the jury would have disbelieved these witnesses even had it been disclosed that they received "special" meals and were allowed to telephone their families.

Two of the witnesses, Kerry Caldwell and Michael Shepherd Bey, later testified that they were actively using drugs during the time of their cooperation, although neither of them has testified that he used drugs while incarcerated. The MLB affidavit states that Shepherd Bey used drugs while in the St. Clair County jail, but Shepherd Bey has not so testified. Even if the witnesses did use drugs,

- 21 -

there is absolutely no allegation or evidence that the government was aware of this illegal drug use or that it should have been. The government cannot violate Brady by failing to disclose information that it does not know. United States v. Turner, 104 F.3d 217, 220 (8th Cir. 1997). The witnesses were cross-examined extensively about their prior drug use, and there is no evidence that they testified falsely. The jury was made very aware that many of these witnesses were drug users, and the jury was able to consider that evidence fully in weighing the witnesses' credibility.

### 3. Government Notes

Without any evidence to support their claims, defendants argue that the government violated Brady by not turning over law enforcement officer rough notes. There was never any order in the case that notes should be disclosed, and there is no legal requirement to do so. Defendants base this argument on the MLB affidavit statement that agents took notes when they interviewed him, yet there is no evidence that these notes exist or, more importantly, that they contain material favorable to the defense. There can be no reasonable expectation that law enforcement notes would change the outcome of this trial.

- 22 -

## B. Perjured Testimony

The defendants' claims of "perjury" are nothing more than inconsistencies in testimony of witnesses.

For example, defendants argue that Ronnie Thomas Bey committed perjury when he testified that he was dealing with co-defendant "Mack El" in 1986 to 1987, but other trial testimony showed that Mack El was in prison during that time. Defendants argue that Thomas Bey's testimony regarding a 1988 murder must have been false because he testified that Gerald Hopkins was involved, yet Hopkins was incarcerated at the time. Thomas was extensively cross-examined about these alleged inconsistencies at trial. Defendants cannot now complain about something that was fully developed at trial.

Several other claims suffer this same problem: while defendants characterize them as "perjury," they are no more than inconsistencies among witnesses' trial testimony. Among these claims are those relating to Rudy Weaver's testimony about the Bryan Hall murder, Earl Parnell's testimony about the Antar Tiari shooting, a supposed conflict between the testimony of Earl Parnell and Ronnie Thomas Bey as to the source of Ronnie Thomas Bey's supply of drugs in the late seventies, and Ronnie Thomas Bey's supposed inconsistent statement of the reasons he shot George Noel. None of these rise to anything more than mere

- 23 -

inconsistencies that could have been, and in most cases actually were, explored at trial. More important, of course, is that these claims could and should have been raised on direct appeal, as they are certainly not "newly discovered," since they deal with inconsistencies at trial.

Defendants also argue that law enforcement officers Salvatore Cira, Robert Dwyer and Donald Mandrala committed perjury before the grand jury. These arguments fail both as a matter of law and as a matter of fact. Here, as the Court of Appeals noted, there was "overwhelming evidence" against each of the defendants. The supposed grand jury "perjury" in each case consists of a law enforcement witness telling the grand jury what one of the testifying conspirators reported during the investigation. For example, Agent Dwyer is accused of perjury because he said that Earl Parnell told him he was present at the Tiari murder, but Parnell later testified that he arrived on the scene right after the shooting, and that that is what he told Dwyer. Dwyer also is accused of perjury because he told the grand jury that George Noel said Ronnie Thomas shot him because he did not embrace the "Moorish religion." Defendants argue this was perjury because Dwyer's report referred to the reason as being a dispute with Jerry Lewis Bey, and because Noel testified at trial that he didn't know the reason he was shot. Similarly, Salvatore Cira is accused of perjury because he told the grand

- 24 -

jury that Rudy Weaver admitted involvement in the 1970s murder of Jackson Bey,
something Weaver denied at trial. He is also alleged to have committed perjury
because his grand jury testimony conflicts slightly with Ronnie Thomas' about the
identities of victims, dates and locations of murders Thomas testified about.

As stated above, the allegations of perjury before the grand jury fail both as
a matter of fact and as a matter of law. They are no more than minor
inconsistencies among witnesses, and any possible error before the grand jury was
rendered harmless by the guilty verdicts and the overwhelming evidence presented
at trial.

I have also reviewed the defendants' arguments that the government
prosecutors and law enforcement witnesses took inconsistent positions in later
prosecutions of others, including in the cases of United States v. Noble Bennett, et
al., No. 90-206CR(4), and United States v. Robert Baker, et al., No. 94-CR-
82DJS. The statements made by counsel or the law enforcement witnesses in
pleadings and search warrant applications simply do not contradict, in any
material way, the positions taken at trial of this matter.

I do note that in the Baker matter witness Earl Parnell testified that he had
informed law enforcement officers investigating this case that Baker was a "dirty
cop," who took guns and drugs from people he stopped and "looked out" for drug

- 25 -

dealers like Parnell. Defendant Jerry Lewis Bey argues that this evidence, had it been disclosed, would have "undermined the government's theory of its case and altered the jury's verdict in favor of defendant." Baker, however, did not testify here, and his later conviction simply has nothing to do with this case.

Additionally, to the extent defendants all argue that the government committed "perjury" or otherwise violated their rights because government prosecutors or agents made statements in later cases that, according to defendants, undermine the government theory of the "enterprise" in this case, defendants are simply wrong. The Eighth Circuit carefully considered the defendants' appeals on the enterprise element of the RICO charges, and determined that the government properly proved the Jerry Lewis Bey narcotics organization as the RICO enterprise. To the extent people have, before or after this trial, referred to the Moorish Science Temple as a corrupt "enterprise," they would undoubtedly been correct in their use of the English language, but such a reference does not contradict the prosecution's legal theory at trial, nor does it alter the proof adduced at trial, which the Court of Appeals found to be entirely sufficient under the RICO statute.

There are several other miscellaneous arguments raised by the defendants, but none provides any basis for relief. Many are simply rehashes of trial issues

- 26 -

that should have been, or were, raised at trial and on appeal (such as the argument regarding co-conspirators' statements, and several arguments that evidence was improperly admitted). Others are simply meritless, and there could be no benefit from an extended discussion. To the extent I have not discussed specific arguments, I am denying them for the reasons stated in the government's brief.

## IV. Conclusion

Defendants' requests for relief under Rule 29 are time barred. Defendants' requests for relief under Rule 33 are also time barred, but are also overruled on the merits: the supposed "new" evidence is not new, it is merely impeaching, at best, and it would not have changed the outcome of the case. Finally, to the extent defendants generally seek to vacate or set aside their convictions and seek to have the charges against them dismissed, they are seeking relief that should have been brought under 28 U.S.C. § 2255. They have not, however, shown that they are entitled to any relief, and so the motions will be denied in their entirety.

Under 28 U.S.C. § 2253, an appeal may not be taken to the court of appeals from a final order in a § 2255 proceeding unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B). To grant such a certificate, the justice or judge must find a substantial showing of the denial of a federal constitutional right. Id. at § 2253(c)(2); see Tiedeman v. Benson, 122 F.3d

- 27 -

518, 522 (8th Cir. 1997). A substantial showing is a showing that issues are

debatable among reasonable jurists, a court could resolve the issues differently, or

the issues deserve further proceedings. <u>Cox v. Norris</u>, 133 F.3d 565, 569 (8th Cir.

1997) (citing <u>Flieger v. Delo</u>, 16 F.3d 878, 882-83 (8th Cir.), <u>cert. denied</u>, 513

U.S. 946 (1994)). No such showing has been made by any defendant here. I

therefore will not grant a certificate of appealability in this case. Because I believe

the motions should have been filed as actions under § 2255, I believe that a

certificate of appealability would be necessary to perfect any appeal.

Accordingly,

**IT IS HEREBY ORDERED** that all pending motions for acquittal, for new

trial, and to correct, vacate, or set aside the convictions are denied.

**IT IS FURTHER ORDERED** that the motion of Jerry Lewis Bey for

unsealing of guilty pleas is denied, as is his motion to expedite.

**IT IS FURTHER ORDERED** that this court will not issue a Certificate of

Appealability.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 27th day of <u>November</u>, 2000.

- 28 -